IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| STEVE RIDDICK, ) | CASE NO. 7:20CV00096 | |
| Plaintiff, ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| JEFFERY B. KISER, *et al.*, ) | By: Hon. Thomas T. Cullen | |
| Defendants. ) | United States District Judge | |

Steve Riddick, a Virginia inmate proceeding *pro se*, filed this civil rights complaint under to 42 U.S.C. § 1983, alleging that prison officials tried to place him in a dirty cell and used excessive force against him. The matter is before the court on dispositive motions by Riddick (ECF No. 100) and by two groups of defendants: Gary Adams, Jeffrey Artrip, Marcus Elam J. Fannin, Jeffrey Kiser, and Jennifer Messer (ECF No. 58); and  Larry Collin, Z.M. Mannon, C. Messer, marry Mullens, J. Mullens, and B. Phillips (ECF No. 83). After review of the record, the court concludes that the defendants' motion to dismiss must be granted, the defendants' motion for summary judgment must be granted in part and denied in part, and Riddick's motions for summary judgment must be denied.

## I.     BACKGROUND

Riddick in currently incarcerated at Red Onion State Prison ("Red Onion"), a facility operated by the Virginia Department of Corrections ("VDOC"), and was an inmate there at the time his claims arose. In Riddick's amended complaint (ECF No. 13), he alleges the following sequence of events as the basis of his claims.

On February 1, 2019, at 11:00 a.m., officials moved Riddick from C-3 Pod to C-5 Pod, cell 501, without informing Riddick of the reason for the move. Cell 501 was "filthy," with

chipped paint all over the floor, urine and feces on the toilet, "a brown ring of feces inside the toilet," and a "strong urine smell." (Am. Compl. 4 [ECF No. 13].)[1] The water to the cell was also not working. Riddick asked staff members for cleaning supplies and a glove, but no one obliged his request.

After Riddick first entered cell 501, Officer B. Phillips in the control booth allegedly told him via the intercom that "he'd beat [his] black ass, called [him] a [n****r[2]] multiple times, told [him] he was in hell now [and] that [he] wouldn't receive anything in that pod, C-5 not even [his] meals." (*Id.* at 11.) Riddick did not receive a lunch meal on February 1, 2019.

About 11:30 a.m., Riddick complained about the cell to Unit Manager Larry Collins. Collins said he would have maintenance fix the water problem and have a staff person bring cleaning supplies. In fact, no one brought cleaning materials. At about 3:00 p.m., Collins returned and asked Riddick if he had a television, radio, and "J-Pay 5 player," also known as a JP5. (*Id.* at 6.) Riddick said yes. Collins returned five minutes later with Sergeant Z. M. Mannon and Officers J. Mullins,[3] C. Messer, and Barry Mullens. Collins told Riddick to pack his property for a cell move, which Riddick did. Once officers took Riddick out of his cell, Collins took Riddick's JP5 player, USB cord, and adapter and plugged the player into the pod kiosk. Then, Collins "intentionally dropped [Riddick's] player on the pod floor [and] smiled at [him,] damaging [the] player." *Id.* at 7.

---

[1] For the sake of consistency, all page cites to the record in this memorandum opinion refer to the page numbers assigned to the documents by the court's electronic filing system.

[2] The court has abbreviated this vile, racist term.

[3] This officer is referred to in the amended complaint as J. Mullens, but the defendant's pleadings indicate that the correct spelling is J. Mullins. The clerk will amend the court's docket to correct the spelling of this defendant's last name.

At this point, "Mannon went inside the pipe chase closet [and] turned the hot water on in [Riddick's] sink, saying, "His water[']s on, we don't have to move him."[4] (*Id.*) Collins agreed. Mannon stated, "Good, I didn't feel like doing any paperwork anyway." (*Id.*) While Riddick stood outside the cell, Mullens and Mannon "verbally harassed [him]" for ten minutes by accusing him of killing his pregnant girlfriend and her baby. (*Id.* at 8.) After the officers placed Riddick back into cell 501, Mannon and Mullens continued to harass him while Collins watched.

After Collins and the other officials left the pod, Riddick alleges that Mannon and Mullens returned to harass and threaten Riddick for about ten minutes, "saying they were going to beat [his] black ass," calling him "a bitch" and "a baby killer." (*Id.*) Riddick responded, calling them "cowards." (*Id.* at 9.) About 4:00 p.m., Mannon went into the pipe chase and "sprayed one long burst of O.C. spray, a clear chemical spray in [Riddick's] cell's top vent."[5] (*Id.*) Riddick was standing by the cell table. Immediately, he "began coughing, choking[, and] spitting up fluid." *Id.*  Mullens and Mannon saw his reaction through the window, but they did not offer any assistance or call medical staff.

At about 4:45 p.m., Riddick told Messer and J. Mullins that he had been sprayed with O.C. spray and, as an asthmatic, he "needed [and] wanted to see a[ ] nurse." (*Id.*) Messer said

---

[4]  Riddick complains that he had no cold water in his cell until March 28, 2019.

[5]  Oleoresin Capsicum or "O.C. spray" is a chemical agent similar to what is commonly known as pepper spray or mace. It irritates a person's eyes, throat, and nose. *See Park v. Shiflett*, 250 F.3d 843, 848-49 (4th Cir. 2001) (describing the physiological effects of OC spray). "The effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." *Id.* at 849.

he "didn't care," and J. Mullins said he "didn't see it [and Riddick] shouldn't have been running [his] mouth." (*Id.* at 10.) Neither officer called for medical assistance. Riddick also pushed the cell's intercom button, trying to get Phillips in the pod booth to contact medical staff, but he received no answer.

Around 6:15 p.m. that evening, Riddick filed an emergency grievance, asking for medical attention, and the nurse assessed him less than an hour later. He complained that since being sprayed with O.C. spray, he had been having "chest, face, neck, throat, stomach, and head pain, heart flutter, blurry vision, lightheadedness, dizz[i]ness, shortness of breath, nausea [and] fatigue," and he asked for an inhaler. (*Id.* at 12.) The nurse said that Riddick had been assessed and left.[6]

On February 2, 2019, during 6:00 a.m. pill pass, Riddick tried to talk about his chest pain symptoms to Nurse Stump; she told him to submit an Emergency Grievance. When Riddick tried to do so at 7:00 a.m., Mullens told him the nurse would see him later that day for a psychiatric physical and did not sign or deliver the Emergency Grievance. Nurse Stump assessed Riddick for chest pains around 11:00 a.m. but did not add him to the doctor's list. Mullens then signed the Emergency Grievance and Sgt. Mannon later answered it, although Riddick contends medical staff should have done so.

On February 4, 2019, Riddick placed a sick-call request and saw Nurse Stump the next day. As the nurse assessed him, Riddick told her about the February 1, 2019, O.C. spray incident and the symptoms he was still experiencing. During the exam, Mullens "repeatedly

---

[6]  The court granted summary judgment for the medical defendants in this case in a previous memorandum opinion and order. (ECF Nos. 156 & 157.)

called [Riddick] a stupid [n****r]" and asked him "how long [he'd] been full of shit." (*Id.* at 15.) Stomp did not put Riddick on the doctor's list. On February 4, 2019, Riddick also talked to Qualified Mental Health Professional ("QMHP") Trent about being sprayed with O.C. spray. Trent said that he and another QMHP had been notified that officers had used O.C. spray on Riddick. (*Id.* at 20.)

On February 5, 2019, Warden Kiser, Assistant Warden Artrip, Major Tate, Collins, Lieutenant Lambert, and Mannon came to Riddick's cell and heard his complaints about the events of February 1, 2019. Kiser said he would have investigator J. Fannin collect information. At that time, Riddick says Mannon did not deny spraying Riddick with O.C. spray. On February 6, 2019, Fannin took statements from Riddick and said that "he'd seen the incidents with Mannon [and] Collins on video which ha[d] been saved. Fannin told [Riddick] he'd turn the incidents over to S.I.U., Special Investigations Unit," which he later verified to Riddick he had done. (*Id.* at 19.) No one from SIU, however, ever talked with Riddick. When Riddick filed a complaint about the lack of investigation, Fannin responded about a later incident and said nothing about the February 1, 2019, incident. Riddick asserts Fannin's omission was to "cover" for Mannon and to retaliate against Riddick. (*Id.* at 32–33.) Mannon worked in Riddick's pod for months after this incident, although policy allegedly required that Mannon be kept separate from Riddick during the investigation of the spraying incident.

On February 21, 2019, Riddick learned that officers had placed him under a grievance limitation for 90 days on February 11, 2019. Under the restriction, Riddick could file only a

certain number of grievances per week.[7] He alleges that Messer, Kiser, and Artrip implemented this grievance limitation in retaliation for the grievances Riddick filed about the February 1, 2019, incident. He also complains that they did so without following VDOC policy to have a meeting with Riddick in person. When Riddick filed an unsuccessful grievance about the grievance limitation, despite alleged policy violations, G. Adams upheld it, and Kiser and M. Elam refused to overrule that decision when Riddick appealed.

## II.  DISCUSSION

### A.  Defendants' Motion to Dismiss

Defendants Warden Jeffery B. Kiser, Assistant Warden Jeffrey Artrip, Grievance Coordinators Jennifer Messer and Gary Adams, Regional Director Marcus Elam, and Red Onion investigator J. Fannin have filed a motion to dismiss Riddick's claims against them. (ECF No. 58.) Riddick has responded to their motion and moves for summary judgment against them. (ECF No. 70.)

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).[8]

---

[7] The court takes judicial notice of VDOC Operating Procedure ("OP") 866.1, Offender Grievance Procedure, available online. OP 866.1(K) provides that the Facility Unit Head should determine, on a case-by-case basis, whether an inmate has abused the grievance procedures through excessive or repeated misuse that hinders other inmates' access and staff's ability to investigate and resolve complaints in a timely manner. A grievance limitation may last no longer than 90 days per occurrence and may restrict an inmate's filings to no less than one informal complaint and one regular grievance per week.

[8] The court has omitted internal quotation marks, alterations, footnotes, and/or citations here and throughout this Opinion, unless otherwise noted.

In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court is not bound to accept as true a legal conclusion couched as a factual assertion, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor should the Court accept a plaintiff's "unwarranted deductions, footless conclusions of law, or sweeping legal conclusions cast in the form of factual allegations" *Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996).

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). To state an actionable claim, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face," rather than merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Liberally construed, Riddick alleges that:[9] (1) Fannin did not ensure the SIU investigation of the O.C. spray incident was conducted properly and failed to respond to Riddick's grievance document about that investigation "out of retaliation" and "to cover up for Sgt. Mannon" (Am. Compl. 32); (2) on February 11, 2019, J. Messer, Kiser, and Artrip placed Riddick under a grievance limitation in retaliation for his complaint forms about the O.C. incident, his broken JP5 player, and denial of medical care, and they did so in violation

---

[9] The court has not adopted Riddick's system of numbering his claims, and instead, has liberally construed and given them number or letter designations for the purpose of this memorandum opinion and order.

of due process and VDOC procedures; and (3) Adams, Kiser, and Elam upheld the grievance limitation when Riddick grieved and appealed it.

As to Fannin, Riddick has no constitutional right to be informed about the status of any official investigation or to have such an investigation instigated in the first place. *See, e.g., Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). Even if Fannin violated some VDOC procedure by failing to ensure that the SIU conducted an outside investigation of the O.C. spray incident, such violations of state policies or regulations are not independently actionable under § 1983. *Brown v. Angelone*, 938 F. Supp. 340, 344 (W.D. Va. 1996) ("[A] state's failure to abide by its own law as to procedural protections is not a federal due process issue.") (citing *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990)). Thus, the court must grant the motion to dismiss as to claim (1) regarding the investigation of the O.C. spray incident.

Riddick also ties an accusation of retaliation to his claim against Fannin. The court finds no merit to this assertion. To state a First Amendment retaliation claim, Riddick "must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between [Riddick's] protected activity and the defendant's conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (*Martin II*); *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (*Martin I*). "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin I*, 858 F.3d at 249. A conclusory assertion that a prison official

acted with a retaliatory motive is insufficient to state an actionable constitutional claim under § 1983. *Adams v. Rice*, 40 F.3d 72, 74–75 (4th Cir. 1994) (finding § 1983 retaliation claim was properly dismissed where plaintiff provided only conclusory assertion of retaliation with no facts to connect defendant's adverse action to plaintiff's protected activity). Moreover, "[c]laims of retaliation must . . . be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id.* at 74.

Riddick fails to allege facts to support the necessary elements of a retaliation claim against Fannin. Specifically, Riddick does not identify what constitutional right he exercised that, in turn, motivated Fannin's alleged decision to keep Riddick in the dark about the SIU investigation. Moreover, the court cannot find that the lack of an investigation (to which Riddick has no protected right) is an adverse action likely to deter persons of "ordinary firmness" from the exercise of their rights. *Martin I*, 858 F.3d at 249. Because Riddick's unsupported assertion that Fannin's actions were retaliatory is not a sufficient factual basis for a plausible constitutional claim that is actionable under § 1983, the court will grant the motion to dismiss Riddick's claims against Fannin.

Riddick also accuses J. Messer, Kiser, and Artrip of retaliating against him for filing a grievance about the O.C. spray incident by imposing the February 2019 grievance limitation. VDOC procedures permit such limitations only under certain circumstances—excessive filings or habitual misuse of the procedures. Riddick does not provide any evidence that his grievance history did *not* meet either of these circumstantial justifications for the grievance limitation. Nor does Riddick allege facts which, taken as true, would establish that Kiser and his cohorts imposed the limitation because of particular grievances he raised. *See, e.g., Harnage*

*v. Brighthaupt*, 168 F. Supp. 3d 400, 416 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) ("Harnage provides no evidence to support his assertion that his placement on grievance restriction was the result of retaliation rather than a consequence of the fact that he had filed what DOC policy deemed to be an excessive number of grievances in a 60-day period. Thus, Harnage cannot establish a retaliation claim . . . because he has failed to provide evidence of a retaliatory motive for the adverse action.").

In addition, Riddick does not sufficiently allege that the February 2019 grievance limitation chilled his rights to exercise his First Amendment rights. It is undisputed that the limitation was only 90 days in length and that it did not prohibit Riddick from filing all informal complaints or grievances during that time. Moreover, court records indicate that, since the imposition of the grievance limitation, Riddick has filed no less than *16* § 1983 lawsuits in this court. Thus, as a practical matter, the limitation has done nothing to deter or prevent Riddick from exercising his right to access the court. *See Lane v. Varner*, No. CIV. 3:CV-07-0177, 2008 WL 598165, at *2 (M.D. Pa. Feb. 29, 2008) (holding that dismissal was warranted because placement on grievance restriction for 90 days did not constitute "adverse action" as required for retaliation claim); *id.* ("[C]ourts have found that placing an inmate on grievance restriction is not the type of action that would deter a prisoner of ordinary firmness from engaging in constitutionally protected activity and, as such, fails to constitute an adverse action.") (citing *Moore v. Sergent*, 22 F. App'x 472 (6th Cir. 2001); *Dantzler v. Beard*, No. Civ. A. 05-1143, 2007 WL 44208, at *3 (W. D. Pa. Jan. 5, 2007)).

Finally, as discussed, violations of VDOC procedures do not, standing alone, constitute constitutional due process claims. *Brown*, 938 F. Supp. at 344; *Holcomb v. Lykens*, 337 F.3d 217,

224 (2d Cir. 2003) (noting that neither state policies nor "state statutes . . . create federally protected due process entitlements to specific state-mandated procedures."). Therefore, even assuming that the defendants failed to follow all applicable VDOC policy provisions in imposing the grievance limitation or in upholding it during Riddick's appeals, such violations of state policies do not provide an actionable constitutional claim under § 1983. For these reasons, the court will grant the motion to dismiss Riddick's claims against defendants Fannin, Kiser, Artrip, J. Messer, Adams, and Elam. Under the same analyses, the court must deny Riddick's motion for summary judgment as to these claims.

## B.  Defendants' Motion for Summary Judgment

### 1. Standard of Review

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Where, as here, a party supports its motion with affidavits and documentation, the plaintiff must present sufficient evidence that could carry the burden of proof of his claims at

trial. *See id.* He "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248. A *pro se* litigant's verified complaint must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence" to defeat an adequately supported motion for summary judgment. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992). The court's inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where the record contains an unchallenged videotape capturing the events in question, the court must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

*2. Defendants' Summary Judgment Evidence*

Defendants Larry Collins, Z. M. Mannon, C. Messer, Barry Mullens, B. Phillips, and J. Mullins have moved for summary judgment. (ECF No. 83.) In support of their motion, they offer affidavits from Collins, Mannon, and Fannin concerning the events of February 1, 2019. Riddick filed a response to their motion that he titles as a cross motion for summary judgment. (ECF No. 100.)

The defendants assert that on February 1, 2019, at approximately 12:06 p.m., Riddick was moved from C-3 Pod to C-5 Pod. Collins explains that when an offender moves from one cell to another, correctional officers move that inmate's property because the inmate is escorted wearing restraints. Collins does not recall if he dropped and broke Riddick's JP5 player on February 1, 2019, as Riddick alleges. Collins states, however, that he has reviewed the surveillance camera footage from that day and time. (*See* DVD [ECF No. 123].) It shows that Collins was holding Riddick's JP5 player when it dropped. Collins picked it up, plugged it into the kiosk for several minutes, and returned it to Riddick in his cell. Collins states, "To the best of my knowledge, the JP5 player was working when it was returned to Riddick" that day. (Aff. of L. Collins ¶ 6, Sept. 24, 2020 [ECF No. 84-1].)

Mannon states that on February 1, 2019, he forgot his Duty Belt containing his O.C gas canister at home. Video of Mannon checking in for the day confirms that he did not have his duty belt. He states that he worked his shift without it. Records also show that Mannon did not check out any O.C gas canister at any time during his shift that day.

According to the C-5 Pod logbook and video footage, when Riddick complained that no water would come out of the sink in his cell that day, officers removed Riddick from the

cell while officers attempted to fix the water issue. (Aff. of Z. Mannon ¶ 5 & Attach. [undated] [ECF No. 84-2].) Once Mannon fixed the water problem and the cell sink was operational, officers placed Riddick back into the cell. Riddick then complained that the water would not cut off. Mannon went to the "pipe chase" and was able to adjust the water valve to resolve the issue with Riddick's sink. (*Id.*) He offers copies of a logbook from the C-5 Pod showing that he fixed Riddick's water and that Riddick was disruptive, using profanity, and making threats. Mannon denies that he disbursed O.C spray into Riddick's cell on February 1, 2019.

On February 6, 2019, Warden Kiser assigned Fannin to investigate Riddick's allegations that Mannon used O.C gas or spray on him on February 1, 2019, at cell C-501 and that the cell was dirty when officers placed Riddick into it. Fannin took statements from Riddick, reviewed video clips, questioned Mannon, and checked logbooks. Mannon reported that he had no O.C. spray with him that day. He told Fannin that, after he believed the water to cell C-501 was fixed, Riddick complained about the water pressure. Mannon reported going back into the pipe chase and reducing the water pressure, at which time Riddick became "verbally combative." (Aff. of J. Fannin ¶ 7 [undated] [ECF No. 84-3]. Mannon also told Fannin that he did not utilize O.C. spray that day.

Fannin states that the video footage confirmed[10] Mannon was not wearing his duty belt on February 1, 2019, and did not show Mannon spraying O.C. gas on Riddick or toward his cell. When Fannin questioned other officers present, they stated that they did not observe Mannon using O.C gas on Riddick. Although officers are required to prepare an incident

---

[10] The video footage is part of the record, and the court has independently reviewed the footage. *See infra* § II.B.3

report regarding any use of O.C gas, Fannin did not find any incident report concerning a use of O.C gas on Riddick on February 1, 2019.

Finally, Fannin states that, "[a]ll cells are cleaned before any offender is moved into any cell." (*Id.* at ¶ 11.)  Fannin states that he "could not find any evidence to substantiate Riddick's allegation that his cell, cell C-501, was filthy" when officers placed him there on February 1, 2019. (*Id.* at ¶ 12.)

*3. The Claims*

Liberally construed, Riddick's amended complaint makes the following claims related to the O.C. spray incident on February 1, 2019: (A) Collins ordered other officers to place Riddick in cell C-501, which had not been cleaned and had no running water, in violation of his Eighth Amendment rights and in retaliation for his exercise of his First Amendment rights to file grievances and participate in lawsuits;[11] (B) Collins intentionally damaged Riddick's JP5 player in retaliation for the same reasons as in claim (A); (C) Officers C. Messer, Phillips, B. Mullens, J. Mullins, and Sgt. Mannon knew the condition of C-501 and were deliberately indifferent to the risks associated with placing Riddick in that cell; (D) Mannon used excessive force against Riddick by spraying O.C. gas into his cell; (E) C. Messer, B. Phillips, B. Mullens, J. Mullins, and Sgt. Mannon failed to get Riddick medical attention after he was sprayed with O.C. gas, which constituted deliberate indifference to his serious medical needs as an asthmatic and retaliation; and (F) Sgt. Mannon sprayed Riddick with O.C. gas to retaliate against him for

---

[11]  Riddick asserts that Collins placed him in a dirty cell in retaliation for two events: in late January 2019, Riddick filed a complaint form about Collins and Lambert "trying to intimidate [Riddick] into going through the Step Down Program again" (Am. Compl. 26); and on January 17, 2019, Riddick "became a lead plaintiff in the class action lawsuit against the VADOC's Step Down Program filed by White & Case & the A.C.L.U." (*Id.*) Riddick states that this lawsuit "may have been motivation for Collins & the other defendants' actions." (*Id.*)

"the incident involving Sgt. Mannon, Collins, C. Messer and B. Mullens [fifteen] minutes prior." (Am. Compl. 23.)

Claims (A) and (C): The Dirty Cell

Riddick alleges that Collins, C. Messer, Phillips, Mullens, Mullins, and Mannon all knew that cell C-501 was dirty and posed serious health risks to Riddick if he was placed there. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that only the "unnecessary and wanton infliction of pain" implicates the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). Thus, to sustain a conditions-of-confinement claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Riddick's allegations do not make these showings. He admits that, within a short time after he was placed in the cell, officers fixed the sink so that he had water. He does not allege that the conditions of cell C-501 thereafter deprived him of any necessity for life, such as food, shelter, or warmth. Riddick also does not state facts showing that he suffered, or was at any

serious risk of suffering, any serious injury from the cell conditions of which he complains, such as a dirty toilet bowl, dirty walls, and chipped paint on the floor. On these facts, the court concludes that the defendants in claims (A) and (C) are entitled to summary judgment as a matter of law as to any alleged Eighth Amendment violations regarding cell conditions. Therefore, the court will deny Riddick's dueling summary judgment motion as to these claims.

### Claim (B): The Broken JP5 Device

Riddick contends that Collins should be liable under § 1983 for intentionally damaging his JP5 player. This portion of claim (B) is without merit.

"[W]here a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure, the state cannot predict when the loss will occur"; therefore, "if a meaningful post-deprivation remedy for [such a] loss is available," the inmate has no constitutional due process claim, regardless of whether the employee's actions were intentional or the result of negligence. *Hudson v. Palmer*, 468 U.S. 517, 532, 533 (1984). Riddick's allegation that Collins purposely dropped and harmed his device falls squarely in this category of due process property claims under *Hudson*. Inasmuch as Riddick possessed tort remedies under Virginia state law such as the Virginia Tort Claims Act, *see* Va. Code Ann. § 8.01-195.3, he cannot pursue a constitutional claim under § 1983 for the alleged property loss. The court will grant the defendants' summary judgment motion, and deny Riddick's motion, as to this due process portion of claim (B).

### Claim (D): Excessive Force

"After incarceration, only the unnecessary and wanton infliction of pain on prisoners constitutes cruel and unusual punishment" in violation of the Eighth Amendment. *Whitley v.*

*Albers*, 475 U.S. 312, 319 (1986); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). To prove an excessive force claim, an inmate must satisfy not only the subjective component (that the correctional officers acted with a sufficiently culpable state of mind), but also the objective component (that his alleged injury was sufficiently serious in relation to the need for force) to establish constitutionally excessive force. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998). Riddick must therefore prove that, subjectively, the force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good[-]faith effort to maintain or restore discipline." *Id.* This determination considers such factors as the amount of force used in relation to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." *Williams*, 77 F.3d at 761.

To prove the second, objective component of his claim, Riddick "must show that correctional officers' actions, taken contextually, were objectively harmful enough to offend contemporary standards of decency." *Stanley*, 134 F.3d at 634. This part of the analysis "evaluates the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." *Id.* In short, the "core judicial inquiry [is] the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

"It is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas[,] or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008). Here, Riddick asserts that while he was standing alone in his cell, Mannon disbursed O.C.

spray into the vent of that cell. Riddick also alleges that, as an asthmatic, he suffered harmful effects from the O.C. gas, including "coughing, choking, [and] spitting up fluid." (Am. Compl. 9.) He also claims he advised a nurse later that day that, since being sprayed, he had experienced pain in his chest, face, neck, throat, stomach, and head, as well as "heart flutter, blurry vision, lightheadedness, dizz[i]ness, shortness of breath, nausea, [and] fatigue." (*Id.* at 12.) Mannon offers evidence showing that he did not carry a canister of O.C. spray with him on February 1, 2019. He also denies spraying O.C. spray through the vent into Riddick's cell that day as he is accused of doing.

Riddick has asserted for months that video footage of the events around his cell that day from the surveillance cameras in C-5 Pod would support his version of events by showing that Mannon reentered the pipe chase after Riddick was returned to cell C-501. The record includes four clips of surveillance camera footage:

- Prison employee entry with x-ray machine, from 5:33 a.m. to 5:33:34 a.m.

- C-5 Pod, empty, from 9:00 a.m. to 9:02 a.m.

- C-5 Pod, upper camera, from 15:53 p.m. to 16:08 p.m.

- C-5 Pod, lower camera, from 15:53 p.m. to 16:08 p.m.

The defendants characterize this footage as a response to the court's order directing that they provide to Riddick and the court "any video recordings of the February 1, 2019, incident at issue in this case." (Order, Jan. 14, 2021[ECF No. 117].) Riddick presents a counter-affidavit (ECF No. 145-1) asserting that the video in the record does not depict events of February 1, 2019, as he remembers them and claiming that this footage features some other inmate.

Riddick states that during the entire incident on February 1, 2019, Mannon was wearing a long coat that does not appear in the submitted video clips.

On this evidence, the court finds that genuine issues of material fact remain in dispute as to Riddick's claim that Mannon used excessive force against him on February 1, 2019, by spraying O.C. spray into his cell through the vent when he posed no threat to anyone. Riddick's verified Amended Complaint states facts meeting the elements of an excessive force claim under *Whitley*, *Hudson, Stanley*, and *Iko*. Mannon's evidence contradicting Riddick's statements about the incident creates material factual disputes that must be resolved at trial. And because the video footage in the record is not unchallenged, the court cannot consider it to render either party's version of events "so blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. The court will deny the motions for summary judgment as to the claim against Mannon for excessive force.

Claim (E): Deliberate Indifference to Serious Medical Needs

A prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The medical-need portion of this legal standard is objective. It requires facts showing that the inmate's medical condition is "serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The deliberate indifference portion of the constitutional standard is subjective. The plaintiff must show that each defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer*, 511 U.S. at 837. It is not sufficient to show that an official *should have known* of a risk; he or she

must have had actual, subjective knowledge of both the inmate's serious medical condition *and* the excessive risk of harm posed by the official's action or inaction. *Jackson*, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable").

Riddick alleges that when Mannon sprayed the O.C. gas into his cell, Mullens was present, and that he and Mannon witnessed the adverse effects Riddick allegedly suffered from the gas, but did not offer him any assistance or call medical staff to help him. Taking these allegations as true, the court must deny summary judgment for Mullens and Mannon on the claim that they acted with deliberate indifference to Riddick's serious medical needs that allegedly resulted from the O.C. spray in the moments immediately following it. The defendants' evidence that no one sprayed Riddick with O.C. spray that day, however, creates a material dispute as to whether Riddick had any serious need for medical care at any time from O.C. gas sprayed into his cell on February 1, 2019. Therefore, the court will also deny Riddick's summary judgment motion as to claim (E) against Mannon and Mullens.[12]

---

[12] Mannon is entitled to summary judgment to the extent that Riddick has raised a claim that Mannon violated his rights by responding to his emergency grievance on February 2, 2019. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process." *Booker v. South Carolina Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). Moreover, a state official's violation of state procedural regulations, such as the emergency grievance procedure, does not give rise to any federal due process claim. *Brown*, 938 F. Supp.at 344. In any event, when Mannon reviewed Riddick's emergency grievance that day, he knew Riddick had been assessed by medical staff and soon would be again. Such circumstances do not support a claim of deliberate indifference to a serious medical need. *Jackson*, 775 F.3d at 178.

Riddick also claims that he used the intercom to ask Phillips in the control booth to call for medical attention, but Phillips did not answer. But Riddick has not produced any evidence that Phillips was still in the booth at 4:00 p.m., or that Phillips witnessed either the disbursement of the O.C. gas or Riddick's reaction to it. As such, the court cannot find a genuine issue of material fact in dispute as to the deliberate indifference claim against Phillips. Therefore, the court will grant the defendants' motion, and deny Riddick's motion, as to claim (E) against Phillips.[13]

According to the Amended Complaint, about 45 minutes after Mannon disbursed the O.C. gas, Riddick informed officers Mullins and Messer of the O.C. gas dispersal, told them he was asthmatic and needed medical attention, and asked them to call a nurse to help him. They failed to do so. Riddick does not state facts showing that these officers observed or otherwise knew of Mannon's use of O.C. gas against Riddick. Nor does Riddick describe what symptoms, if any, he was visibly displaying when he asked these officers for medical help. Because Riddick has failed to offer competent evidence that either of them knew of a serious medical need, the court cannot find that their lack of assistance constituted deliberate indifference. The court will deny Riddick's summary judgment motion, and grant the defendants' motion, as to claim (E) against Mullins and Messer.

---

[13] Riddick also alleges that when he first entered cell C-501, which occurred at around 11:00 a.m. on February 1, 2019, Phillips threatened him, used racial slurs, and told him he would not get anything in C-5 Pod. Riddick also appears to blame his lack of a lunch meal on Phillips. These allegations, although serious, do not state a constitutional claim that is actionable under § 1983. *See Owens v. Vanmeter*, No. RWT-09-1780, 2010 WL 817315, at *3 n.5 (D. Md. 2010) ("The use of racist epithets, while offensive, is not actionable under 42 U.S.C. § 1983.") (collecting cases). "Words by themselves do not state a constitutional claim, without regard to their nature." *Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C.), *aff'd*, 917 F.2d 1302 (4th Cir. 1990) (unpublished). Second, missing one meal for whatever reason cannot rise to the level of a constitutional violation. *See, e.g., Brown v. Mathena*, Case No. 7:10CV00192 (W.D. Va. May 14, 2010) (Wilson, J.) (dismissing inmate's claim that he missed one dinner meal), *aff'd*, No. 10-6772 (4th Cir. Aug. 26, 2010) (unpublished).

Claims (A), (B), (E), and (F): Retaliation

As discussed, a viable First Amendment retaliation claim must state facts about the plaintiff's exercise of a constitutionally protected right that caused the defendant to take adverse action against him, chilling his future exercise of his protected rights. *Martin II*, 977 F.3d at 299; *Martin I*, 858 F.3d at 249. In claim (F), Riddick asserts that immediately after Mannon and Mullens verbally harassed him and he called them "cowards," Mannon put O.C. gas down his vent to retaliate against him. (Am. Compl. at 8.) Liberally construed, Riddick's allegations state the elements of a retaliation claim against Mannon and Mullens in this instance. The defendants have not moved for summary judgment as to Riddick's retaliation claims. Nevertheless, their evidence that Mannon did not have or use O.C. spray on Riddick that day is sufficient to create a material dispute as to any claim that he did so in retaliation. Therefore, the court will deny Riddick's summary judgment motion as to his assertions of retaliation in claims (E) and (F) against Mannon and Mullens, and these claims will go forward to trial.

The court concludes, however, that the remainder of Riddick's retaliation claims must be summarily dismissed under 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief could be granted. In Claim (A) and (B), Riddick alleges that Collins "may" have been motivated to place him in a dirty cell and damage his JP5 player because Riddick filed grievances and participated in a class action lawsuit. (*See* Am. Compl. at 26.) Riddick further alleges that "[Collins] initiated other staff to attack & retaliate against [Riddick] & his job as

Unit Manager is to protect [Riddick]."[14] (*Id.* at 28.) These conclusory assertions of retaliation are based on pure speculation and are not supported by facts showing any relationship between Collins' actions on February 1, 2019, and Riddick's past grievances or litigation activities.

Riddick's assertions against Messer, Phillips, and Mullins in Claim (E) are similarly factually deficient. He does not identify any constitutional right he exercised that motivated these officers to refuse him access to medical care. For the stated reasons, the court must deny Riddick's motion for summary judgment as to his retaliation claims against Collins, Messer, Phillips, and Mullins.

### III.   CONCLUSION

For these reasons, the court will grant the motion to dismiss filed by defendants Adams, Artrip, Elam, Fannin, Kiser, and J. Messer. The court will grant the other defendants' motion for summary judgment in part and summarily dismiss some claims under 28 U.S.C. § 1915A(b)(1). As to claim D (alleging excessive force by Mannon), claim E (alleging deliberate indifference and retaliation by Mannon and Mullens), and claim F (alleging use of force in retaliation by Mannon), the court will deny summary judgment. The court will also deny Riddick's motions for summary judgment and set the remaining matters for a jury trial.

---

[14] The court notes that Collins, as a supervisory official, cannot be held vicariously liable under § 1983 for the actions of his subordinates. Rather, under § 1983, a supervisory official may be held liable "where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to Riddick.

**ENTERED** this 29th day of September, 2021.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE